UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| MARY LORENA SONNIER, *et. al.* | CIVIL ACTION |
| VERSUS | NO. 6:13-cv-00246 |
| MAGIC CIRCLE CORP., *et. al.* | JUDGE DEE D. DRELL |
| | MAGISTRATE JUDGE PEREZ-MONTES |

**Memorandum in Support of Motion to find Ronald E. Parsons in Contempt and that <u>Ronald E. Parsons has Committed Perjury</u>**

MAY IT PLEASE THE COURT:

On July 15, 2016, Plaintiff took the deposition of defendants' expert, Mr. Ronald E. Parsons.  During this deposition, Mr. Parsons lied under oath about his education, his high school and college grades, his work experience, his employment history, the corporate existence of The Wright Group, Inc., and his financial ties and employment title with The Wright Group, Inc. Because of his perjured testimony, Plaintiff subpoenaed certain documents from The Wright Group, Inc., Parsons's purported employer, and also sought to take its deposition.  This Court issued an Order upholding the subpoena, requiring The Wright Group, Inc. to produce a copy of the Stanphyl Road Irrevocable Trust by January 31, 2107. (Doc. 281).  However, the documents were not produced until February 9, 2017, and the trust documents were withheld.  Parsons has consistently lied to courts concerning his education, qualifications, and hid bias ties to his own

company originated by himself and his common law wife, Cynthia LaFrance.[1]

The subsequent deposition of Mr. Parsons taken March 9, 2017, in his capacity as a 30(b)(6) representative of The Wright Group, Inc.[2], revealed many more lies, under oath, told by Mr. Parsons in depositions, daubert hearings, and trials all across the United States. The necessity of additional subpoenas, investigations, and the deposition of Cynthia LaFrance, Moss Sidell and The Wright Group, Inc. have cost Plaintiff a significant amount of time and money. Ronald E. Parsons is the expert of the defendants' and active participant in this case. Defendants have sought to quash all discovery directed at revealing Mr. Parsons's lies and facts reveal defendant, Traveler's, and its counsel, are both very familiar with Mr. Parsons and that Traveler's has not only used his services extensively over the past two decades but appears to have groomed Parsons to become an expert. Defendant, Great American Insurance Company, is also very familiar with Mr. Parsons and has used his services over the years. Therefore, Plaintiff asks that the defendant insurers pay all costs and attorney's fees associated with Mr. Parsons's conduct. Plaintiff also requests this Court give Mr. Parsons his due process and allow him to appear and defend himself against charges of perjury. Further, Mr. Parsons should be held in contempt of court for failing to comply with this Court's order. (Doc. 281). A perjury conviction of record, if justified, will curtail an incredulous history of misleading courts by putting courts and the public on notice.

## I.   Background

---

[1] The complete copies of the various depositions discussed in this case will be on CD and manually attached as "Exhibit 26."

[2] Parsons represented in his first deposition he was a simple employee of Wright Group, Inc. yet was designated as the corporate representative.

Plaintiff's filed suit against Bemis Manufacturing Company[3] and its insurer, Traveler's, alleging the gas cap Bemis manufactured caused a fire that took the life of their husband and father, Clarence Sonnier, who was burned over 70% of his body when he was sprayed by pressurized gasoline.  After three and a half years of litigation, it was revealed that Bemis had a $30M umbrella policy and Great American Insurance Company was added to the litigation.

On July 15, 2017, Plaintiff took the deposition of the defendants' expert, Mr. Ronald Parsons.  Mr. Parsons lied profusely in his deposition about various aspects of his qualifications to testify as an expert in this case.  After his untruthful testimony was discovered, Plaintiff took the deposition of his supposed employer, The Wright Group, Inc.  As shown below, Mr. Parsons is the founder, co-owner and sole operator in control of The Wright Group, Inc., an enterprise specializing in sworn testimony.  Over the past at least 16 years Mr. Parsons has made tens of millions of dollars serving as an expert witness after lying to opposing parties and courts about his education, qualifications and his financial gain from testifying.  Likewise, he has testified untruthfully and attempted to mislead the Court in this case as well.

## II.  The Real Ronald Parsons

### A.  *Ronald Parsons Ownership of The Wright Group, Inc.*

Mr. Parsons, from the very beginning of the corporate existence of The Wright Group, Inc., (WGI) has very effectively played the shell game and concealed his ownership of the company to courts and to opposing parties.  When questioned about the corporate structure of WGI in depositions he sometimes pretends to be unfamiliar with the identities of the owners and the officers of the company.  Other times he represents that clerical staff are the owners.  He has

---

[3] Other defendants were also sued but they have since been dismissed and are no longer parties.

also stated falsely that some of the owners have passed away.

In his first deposition in this case, Mr. Parsons intended to mislead plaintiff to believe he lived alone with his three dogs in a large house on Wright Group headquarters property.[4]  He stated he rented the house from The Wright Group.  He stated he was "pretty sure" Cynthia LaFrance was the owner of the house but he was not certain of that.  He stated The Wright Group, Inc. was owned by "the LaFrance family", Cynthia LaFrance being "one of the primary owners" and her brother Allen "was also part of the family and worked in the lab."

Cynthia LaFrance was deposed on March 9, 2017.[5]  She admitted she and Parsons have lived together continuously since 1985, that they are "lifetime partners"[6] and they "live like husband and wife."[7]  However, she contends she charges Parsons rent to live in the house on WGI property.[8]  LaFrance stated she was the owner of WGI and that Parsons managed the company.  She stated she and Parsons decided to start WGI around 1984.[9]  Regarding why the corporation was named "Wright Group", the following questioning took place:

Q: And the name Wright Group, where did that name Wright come from, W-R-I-G-H-T?

**A: Wright Group came from, Ron and I were sitting down speaking one time and trying to come up with a name, and we just decided that we'd do it right.**

Q: So it's the Wright Group rather than the wrong group?

---

[4] Parsons's complete deposition was attached to Plaintiff's Motion for Reconsideration (Doc. 264) as "Exhibit 3" and the excerpts on these statements were attached as individual exhibits.  The video clips of these statements were manually submitted as "Exhibit 3A."
[5] LaFrance's complete deposition is annexed as "Exhibit 1."
[6] *Id.* at p. 44
[7] *Id.* at  p. 90
[8] This claim is even more astounding considering that up until the trust transferred the property to her individually, she was the trustee of Mr. Parsons's property owned by the trust.  How could she, as trustee, be looking out for Mr. Parson's best interests by transferring the property to herself and charging Mr. Parsons rent to live in the house?  Parsons admitted in his deposition that LaFrance was never charged rent when the house was in his name or owned by the trust.
[9] But in his deposition in *Wright Group, Inc. v. Kannally*, "Exhibit 14", p. 26-27.  He could not remember who started the business.  "Boy, I honestly don't remember the name…"

**A: That's correct.**[10]

LaFrance stated she put up $6,000.00 to start the business and Parsons ran the business.[11] WGI employees are required to bill at least 1,500 hours per year and their current rate is $150.00 to $275.00 per hour.[12]   According to LaFrance, $275/hr. is the typical rate billed.[13]   Mr. Parsons has always set the hourly rate and she has never questioned his decision.[14]   However, even if WGI's eight billing employees only charged a conservative $200/hr for the *minimum* 1,500 hours then the company would have annual revenue of $2.4M.

At or around the time of the transfer of the WGI property from Parsons's Stanphyl Road Trust to LaFrance personally, or subsequently thereafter, LaFrance purportedly started or purchased many businesses.   These include American Classic Restorations & Marine, Inc., an automotive repair shop; commercial rental property; Uxbridge Pro Storage, a self-storage facility; and The Grille on Maine, a restaurant located in Douglas, MA.   However, LaFrance contends Mr. Parsons is only paid approximately $81,000 per year and does not benefit from WGI revenue.

Public records show in 2003 that all the land on which the house and the WGI headquarters and "laboratory" are located were owned exclusively by Parsons.[15]   He placed all of the WGI property into the Stanphyl Road Irrevocable Trust and named LaFrance as the trustee and himself as the beneficiary.   LaFrance stated the trust was set up to protect all of *their* assets:

**A: We formed the trust together, to protect all the assets, of the house.**

---

[10] LaFrance deposition, p. 75
[11] *Id*. at 77
[12] Parsons complete transcript from his second deposition is annexed as "Exhibit 2."  This statement is on p. 19.
[13] LaFrance deposition, p. 158
[14] Id. at p. 56
[15] Transfer documents are annexed as "Exhibit 3"

Q: And to protect what other assets?

**A: My money.**

LaFrance was not able to explain how putting Parsons's property into a trust could protect her personal assets.  However, she said attorneys they spoke with told them that.[16]

Contrary to Mr. Parsons's false representations in his resume, The Wright Group, Inc. was not started until 1994.[17]  Its Articles of Incorporation list Carolyn Wark as the president, clerk and sole director of the company.  Carolyn Wark was deposed on March 7, 2017.[18]  She stated she worked for Mr. Parsons from approximately 1989-2000.  She stated it was her understanding that Mr. Parsons owned WGI.[19]  She stated Mr. Parsons signed her paychecks[20] and she only saw LaFrance come in to the office every 2-3 months.[21]  She stated she never took orders from anyone other than Mr. Parsons.[22]

However, almost anytime Mr. Parsons is asked about WGI, he gives outrageously false testimony.  Plaintiff respectfully directs the Court to Parsons's deposition in *Argonaut Insurance Co; Great American Insurance Co*, *et. al v. Samsung*, 8:10-cv-1516 (N.D. NY 2010), where Parsons was deposed at The Wright Group, Inc. headquarters office:

Q: Who do you report to at the Wright Group?

---

[16]  Q: But that's your understanding of why you set the trust up?
    A: To protect our assets.  LaFrance deposition, p. 34, "Exhibit 1"
[17] See Wright Group Inc. Articles of Incorporation, attached as "Exhibit 4".  Previously, in 1991, Parsons started a company called Wright Services, Inc., which had an essentially identical corporate purpose.  The Articles of Wright Services, Inc. is attached as "Exhibit 5".
[18] Wark's complete deposition is annexed as "Exhibit 10."
[19] Also, a former employee of WGI has told the undersigned LaFrance did not have an office at WGI and didn't even have a key to the facility.  The employees had to unlock the door and let her in when she came after hours.
[20] See page 8 of Carolyn Wark's Deposition, "Exhibit 10."
[21] *Id.* at 23
[22] *Id.* at 48-49

**A: I report to Mel Lemoyne.  That's my boss.**[23]

In LaFrance's deposition, she stated "Mel" Lemoyne is a nickname for Melissa Lemoyne, one of the secretaries in the front office.[24]  She says there is no other Lemoyne that has ever worked at WGI.[25]  She described Melissa Lemoyne as a "tall blonde."[26]  She stated Lemoyne had no ownership interest in WGI and that Lemoyne would never be allowed to set the rates WGI charged.[27]  The deposition continued…

Q: Tell me about the Wright Group, the corporate structure.  How many people are employed at the Wright Group?

**A: Approximately fifteen.**

Q: Who is the owner of the Wright Group?

**A: Mel Lemoyne I believe has an ownership interest and there other parties at one time, but some of those people have died and I'm not sure quite – I don't know what their position was.**[28]

Q: Do you have any ownership interest in the business?

**A: I don't.**

Q: Are you a salaried employee?

**A: I am.**

Q: Do you receive any compensation in any other manner other than your salary?

**A: No. I am a salaried employee here, other than a company vehicle.**

Q: So Mr. Lemoyne[29] is also the president of the corporation?

**A: I'm not sure of that.**

---

[23] See attached *Argonaut* deposition excerpts, annexed as "Exhibit 6."  This testimony begins on page 12, line 18.
[24] See. p. 55-56 of LaFrance's deposition, "Exhibit 1"
[25] *Id* at 55.
[26] *Id*. at 74-75
[27] This is  also contrary to Parson's testimony in *American Family Mutual v. Electrolux*, where he said the rate structure in WGI is controlled by his manager, "Mel."  See "Exhibit 7", p. 29, line 20, of deposition excerpts.
[28] LaFrance never testified she shared ownership of the company with any other person(s).  If fact in her deposition it was asked:
Q: Have you ever given him (Parsons) any suggestion to believe that you and somebody else own that property?
**A: Never.**  (LaFrance deposition at p. 144)
[29] Notice how the opposing attorney assumes "Mel" is a male and not only does Parsons allow him to be mislead, Parsons lies and says he doesn't know the identity of the current president.

Q: Who are the officers?

**A:  I don't know.[30]**

Q: You have been here for 28 years.

**A:  I've been here for 27 years exactly.**

Q: 27 years, there's fifteen employees, and you don't know who the owners and officers are?

**A: I do not know who the officers are.**

Q: Well, is there somebody at this business who holds the title of president?

**A: Yes. I believe that's Mel.**

Q: Is there a vice president?

**A:  I'm sure there is.  I just don't know who those people are.**

Q: You don't know who the treasurer is if there is one?

**A: I don't.  I'm sure there is, but I just don't know who those people are.**

**…**

Q:  There must be an accounting side or billing side too?

**A: Oh, I'm sure.  I have nothing to do with that.[31]**

As shown above, Mr. Parsons will lie with assumed impunity.  However, more alarming, and in a way impressive, is Parsons's ability to evade detection of his lies under pressure.  The deposition continued as Parsons showed his wit when asked about the real Mel (Melissa) Lemoyne:

Q: The young woman who greeted me at the door, who is she, if you know?  Tall blonde.

**A: Oh, Melissa?**

Q:  I don't know.

**A: Yes.  Okay, there's typically three – well, there's two full-time girls up front and off and on through the years there's been a part-time.**

Q: So what I'm getting at is, there is a clerical staff here as well?

**A: Yes.  There's two girls, Melissa and Jen, who run the front office and then they report to an accounting company.**

Q: So out of the fifteen employees, you have what I would call two clerical employees, Melissa

---

[30] This deposition took place on May 11, 2012.  By this time, LaFrance held the title of president, secretary, treasurer and director.
[31] This is completely opposite to LaFrance's testimony.

and Jen.  Is that correct?

**A: Correct.**

Q: And then you have Mr. Lemoyne, who is the head of the business?

**A: Well, Mel Lemoyne is the head, exactly, oversees the whole entire operation, that's correct.**

Later in the deposition, Parsons was asked about LaFrance's brother, Allen.  The same Allen LaFrance that Parsons insinuated in Sonnier was a co-owner of WGI with Cynthia. However, in this case he could not remember Allen's last name[32]:

Q: Was anyone from the Wright Group ever on-site other than Mr. Wentzell and Mr. Kannally?

**A: Yes, sir.**

Q: Who else?

**A: I believe Allen – I can't remember his last name – Allen was on site**.

Q: Well, who is Allen?

**A: He works in the lab….**

…

Q: Okay.  And do you remember Allen's name?[33]

**A: I apologize.  It'll come to me.  I just….**

On April 24, 2013, Mr. Parsons also gave <u>trial</u> testimony in *New Jersey Manufacturers Insurance Group v. Electrolux, Inc*, 3:10-cv-01597 (U.S.D.C. N.J.).  In this testimony, he also told the jury he was just a lowly salaried employee.  In his deposition, he had apparently stated he may have received bonuses from 1984 to 2009.[34]  When on cross-examination, Mr. Parsons was confused about the meaning of what a "bonus" was and tried to re-enforce his lie by stating he got a yearly $100 Christmas bonus:

---

[32] The reason he suddenly couldn't remember his fiance's brother's last name in this case is because at the beginning of the deposition when asked his address and who he lived with he stated that he lived with his girlfriend, Cynthia LaFrance.  Therefore, he knew if he revealed Allen's last name it would have perked the attorney's interest and the result would be more questioning regarding the ownership of WGI.

[33] *Argonaut* deposition excerpts. "Exhibit 6", p. 22, line 3

[34] Apparently, one of his employees had been deposed in this case, Mike Stoddard, who had disclosed the existence of a bonus that WGI gives to its employees.  Apparently, for every hour above 1,500 hours that its employees bill in a year, Parsons may pay some sort of bonus to the employee.

**A: That's pretty accurate.  Like I said, the last two or three years, no bonus.**

Q: Right.  But there, you said it was ---

**A: It goes to 2009.**

Q: There you said 84' to 2009, correct?

**A: I mean we get a $100 Christmas bonus every year, sir**.[35]

When asked about the time he personally spent on the case he stated:

**A: The Wright Group bills my time.**

Q: It's a lot of money, right?

**A: Define a lot of money.**

Q: Is $100,000 a lot of money?  Billings for one years for one employee.

**A: That's more than what I make, so ---**[36]

Plaintiff believes she has just seen the tip of the iceberg with regards to this issue.  Mr. Parsons has, by his own admission, testified hundreds of times in depositions, daubert hearings, and trials.  In every single transcript Plaintiff has seen, Parsons has given false testimony about the corporate structure of WGI and his true interests in the company if asked by opposing counsel.

### B.  *Parsons Employment History and Work Experience*

Mr. Parsons's qualifications have been challenged at least four times in other cases.  In each case, he was allowed to testify as an expert and the judge cited his extensive experience in fire investigation.[37]  Mr. Parson's fraudulent CV is attached as "Exhibit 27."  From 1979 to

---

[35] See *New Jersey* trial testimony excerpts, p. 103, annexed as "Exhibit 8."

[36] See *New Jersey* transcript, page 107.

[37] In *Rager v. G.E.,* the judge stated his "extensive experience supports a finding that his opinion is the result of a reliable methodology" and cited his over 30 years experience in and investigation of over 3,000 fires.  In *Great American, et. al v. Samsung*, the judge heard evidence that Parsons had two years of college education, that "100% of his business is attributed to origin and cause investigation", and that Mr. Parsons has conducted inspections and evaluations on heavy equipment for battery fires for over 40 years.  In *Slabach v. Electrolux,* the Court cited his two years of college in Industrial Arts, and 29 years experience conducting origin and cause analysis on fires and investigating products for mechanical and electrical failures.  In *Philadelphia Contributorship Ins. Co. v. Electrolux,* the Court did not issue written reasons and as of this date Plaintiff has not been able to obtain a deposition or

present he lists his employment responsibilities as:

> **Responsibilities: Include on site investigation of fire and explosions, investigation of products for mechanical and electrical failures, fire debris collection and analysis.  Other responsibilities include review of testimony and opinions of other experts related to mechanical failures, fire and explosions.  Design analysis of products as it relates to failure modes, which allow for a heat source and first fuel to collect and come together. Mechanical failure analysis of electrical and mechanical components as it relates to performance and product design.**

He also lists various jobs in the auto industry beginning in 1974 up until 1991.[38]  His resume states that he has worked with the above job description from Wright Group, Inc. from 1984 until present and from 1979 to 1984 he worked the same job duties at Eastern Investigations.  Parsons himself stated in sworn deposition testimony he was a fire and cause analyst at Eastern Investigation and was specifically hired by Wright Group, Inc. in 1984 "to complete origin and cause analysis as it relates to fire."[39]  In *New Jersey Manufacturers Association* Parsons told the jury he was <u>offered</u> the Wright Group job position and took it because "it had a lot more opportunity for someone like me.  A much better lab and a much better engineering staff."[40]

However, Carolyn Wark, the former president, secretary and sole director of WGI,[41] stated in her deposition that Ron Parsons, aka Wright Group, Inc., and formerly Wright Services,

---

Daubert transcript in that case.

[38] According to his CV he worked continuously in the auto industry as a mechanic from 1974 to 1979.  From 1989-1991 he lists himself as a service manager of an auto repair shop, apparently as a second job (second shift).

[39] *See p. 9* of *Slabach* deposition testimony excerpts, annexed as "Exhibit 9."

[40] See page 22-23 of the *New Jersey Manufacturers Assc.* trial transcript, previously identified as "Exhibit 8."

[41] Mrs. Wark had no idea she ever held a corporate position in the company.  She stated she must have unknowingly signed the documents appointing her president, secretary, etc.  She stated there was no one else at the company that would have directed her to sign such a document other than Mr. Parsons. See Wark deposition, "Exhibit 10", at page 18, line 11.  LaFrance said in her deposition that Wark was given all the corporate positions because they would get a better interest rate if they showed it was a woman-owned business.  Obviously, the Articles of Incorporation do not show corporate ownership.  If LaFrance was really the owner of the company at that time, and not Parsons, why would they need to represent that they were a woman-owned business in the articles by making Carolyn Wark the president, secretary, director, etc?

11

Inc., during the years she worked there in 1989-2000, was engaged almost exclusively in the business of adjusting claims for wrecked automobiles.[42]   She stated the company was located in an office building and had no "lab" or other off-site facilities.[43]   She did not know of any engineers employed by or affiliated with Mr. Parsons or The Wright Group.[44]   She stated after 1991 or 1992 she was the senior girl in the office who took in the claims and sent out adjusters to look at the wrecked vehicles.[45]   She stated at times there may have been another part-time secretary who would also take in claims but she was familiar with the claims that she took in and with the work she was doing.[46]   She said Parsons/Wright Group did a "substantial" amount of work for Traveler's and also did work for Great American.[47]

She stated the only mechanical inspections or mechanical failure analysis she remembered him doing was for Jiffy Lube.[48]   She said this involved instances where customers of Jiffy Lube would make claims that the service they received at the garage was improper and the work Jiffy Lube did caused mechanical problems to their car.

As for fire investigations, her recollection is that if Mr. Parsons did any fire investigations it was in connection with an insurance claim on a wrecked vehicle.[49]   She later recalled Mr. Parsons starting to do a little bit of fire work, less than 10% of his time, during the last two years of her employment.[50]   Even under vigorous cross-examination by defendants, Mrs. Wark's

---

[42] See Wark deposition, "Exhibit 10", at page 14-16.  This is also completely consistent with the stated corporate purpose of Wright Services, Inc. and Wright Group, Inc. in their Articles of Organization: "To engage in the business of claims adjusting."  She testified Parsons was also doing mechanical inspections for Jiffy Lube.
[43] *Id.* at 22
[44] *Id.* at 22-23
[45] *Id.* at 47-49
[46] *Id.* at 49
[47] *Id.* at 12
[48] *Id.* at 16-17
[49] *Id.* at p. 14
[50] *Id.* at p. 11.  This is also completely consistent with the time period when Parsons got his certification from the National Association of Fire Investigators (NAFI) in 1998 to be a fire investigator and when he was contacted by

recollection was that Parsons was not involved in any fire investigation other than on vehicles.[51]

Mrs. Wark was also shown Mr. Parsons's resume where he described his responsibilities at Wright Group:[52]

**A: I did not know that that was part of his resume at that time.**

Q: Okay.

**A: I never knew him to be doing this even during the years that I worked there.**

Q: Okay. So from --- so from '88 to 2000 – I'm sorry, 89' to 2000 at least, the description that he gave to you of his responsibilities, his responsibilities at Wright Group, Inc., is not accurate?

**A: I don't believe so.  I mean, if he had this type of qualifications or, et. cetera, I didn't know about it.  I knew he did mechanical failure jobs, but not fire origin and investigator.**

Q: Okay. And the – and the mechanical failure job that he did, that was for Jiffy Lube; is that right?

**A: Yes.[53]**

As for his time at Eastern Investigation where he stated he was a "fire cause and origin analyst" from 1979 – 1984, the undersigned has searched diligently for the existence of any company called Eastern Investigation that operated in the Boston area. The Massachusetts Secretary of State has no record of any business by that name and their records go back to 1980.  Likewise, the county where the business was supposedly

---

Traveler's to pick up the Mercedes in the Namerow fire (discussed later in the brief). The Letter from NAFI, annexed as "Exhibit 11."

[51] She did state it was possible he may have been doing fire-related work and she did not know.  However, she processed, reviewed or was aware of all work coming in to the office.

[52] Wark deposition, "Exhibit 10", at p. 25-26.  The job responsibilities were shown on page 10-11 of this brief.

[53] Up until the day before the deposition, the undersigned believed that Wark was possibly a previous owner of WGI.  However, the day before her deposition Mrs. Wark called the undersigned's office and asked why she was being deposed.  The undersigned then realized that Mrs. Wark, although listed as the president and sole director of the company, was simply an office worker.  Parsons and LaFrance both attacked Wark's credibility by alleging she was fired for stealing money from the company and making the company show a loss for several years.  Not only did Parsons and LaFrance not file a criminal complaint against Wark, they did not report her to the bank and they also laid her off in 2000 at her request so she could get unemployment benefits.  In short, Mrs. Wark has nothing to gain or lose by testifying falsely in this case and there is no indication, whatsoever, she lied about WGI or Parsons in her deposition.  To the contrary, her testimony regarding Parsons is corroborated in several respects.

located does not have any record of any DBA by that name in the last four years.[54]  It is possible that Eastern Investigation was operating under a DBA at that time and is now out of business.  However, considering all of his false testimony on other issues, it is highly probable his testimony regarding Eastern Investigation and his job duties there is also false.

LaFrance did discuss Eastern Investigation in her deposition.  She stated she met Ron Parsons while he was employed by Eastern Investigation as a claims adjuster in 1981.[55]  She stated she worked for an insurance company that would assign claims to Parsons to investigate.[56]  Other than Parsons, she stated there were multiple appraisers at Eastern Investigation that would come in to her office.   However, she could not remember the last names of any of the other people that came in from Eastern.  She could only remember men by the names of "Dan" and "Phil" coming in.  When Parsons himself was questioned by Plaintiff, he also could not remember the last names of anyone that he worked with at Eastern, including the owner[57], despite working there for five years and supposedly completing Eastern Investigation's "five year fire training program."[58]

Very outrageous is the Affidavit Parsons submitted in connection with a Daubert challenge in the case *Great American Insurance Co., et. al. v. Samsung*.[59]  In this case, Parsons submitted an Affidavit that stated: "I have evaluated hundreds of pieces of heavy

---

[54] The county records only go back for four years and are then destroyed by the county per state law.
[55] P. 50-51 of LaFrance transcript, "Exhibit 1"
[56] In his deposition in *Kuhnkuhn v. Gill*, page 8, attached as "Exhibit 12", Parsons may have slipped up stated that Eastern was Eastern Adjustments, not Eastern Investigations.  This could be true as it is evident Mr. Parsons has attempted to hide his long history as an insurance adjuster.
[57] Later in the deposition he was shown other testimony where he revealed Frank Moroni as being at Eastern.  He then suddenly remember Maroni's last name.
[58] *Id*.
[59] See paragraph 15 of the Affidavit of Ronald Parsons, annexed as "Exhibit 13."

motorized equipment involved in battery cable fires such as that at issue in the present case.  I have evaluated the designs utilized in the industry for over forty (40) years."  The Federal Judge in the case cited his "over forty years experience" in denying the Daubert challenge.  This affidavit was signed on August 24, 2012, which would make Parsons at least 13 years old, possibly younger, and in junior high or elementary school, when he first started evaluating battery cable designs for fire risks. [60]

Other activities in which Mr. Parsons was involved in the 1980s and 90s were also not fire related.   Omitted from, and contrary to, Parsons's resume and deposition testimony is that in 1984 he and LaFrance started Shrewsbury Adjustment Bureau, an automobile appraisal company.[61]   In 1992, Parsons formed and was president of Wright Warranty Services, Inc., a company formed to engage in the business of "issuing mechanical repair agreements and to settle any repair costs against the mechanical repair agreement."[62]   Also   in   1992,   Parsons   apparently   started   a   business,   Wright

---

[60] See Parsons deposition, "Exhibit 2", p. 123-124
Q: So you would be 31 years old at the time that you were evaluating hundreds of pieces of heavy motorized equipment involving battery cable fire "such as that at issue in the present case…."  Would that be a true statement?
**A: Sure. I worked on cars all through school and worked on repairing battery cables.**

Q: Okay.  So at age 13, you were doing something with battery cables, and that's what justified this first five lines in paragaraph 15?

**A: That's the only thing that makes sense to me.**

[61] See deposition excerpts from Wright Group, Inc. v. Kannally, p. 16, annexed as "Exhibit 14."  Parsons stated that he was also involved in "Wright Investigation" that performed "origin and cause analysis" but the undersigned has found no evidence of such an organization existing in Massachusetts.   Prior to seeing Parsons's deposition testimony in *Kannally*, Parsons had never mentioned the existence of such a business to Plaintiff during his depositions in Sonnier, where he was questioned extensively about his background, or in any other case.  LaFrance also does not identify a business by the name of Wright Investigation.  If such a business did exist, why would Parsons and LaFrance not have incorporated this business as they did their numerous other businesses during this time?
[62] See Articles of Incorporation of Wright Warranty Services, Inc., annexed as "Exhibit 15."

Communications (WCC)[63], that sold and serviced cellular phones.[64]  Subsequently, two other cell phone related businesses were stared.  These businesses were in operation until around the year 2000.[65]  Other activities by Mr. Parsons during this time include the creation of a construction company in 1986, Ringer Construction Company, where he was the president, secretary, clerk, treasurer and sole director of a business formed to build "new residential buildings, remodeling of same and the construction of commercial type buildings and/or the remodeling thereof."[66]  According to Carolyn Wark, any mechanical analysis Parsons did was in connection with his work for the Jiffy Lube garage, which is consistent with the corporate purpose of the Wright Warranty Services, Inc.  There is no indication in Parsons's resume' he was in the construction trade or Wright Group was ever an insurance adjustment business that performed appraisals on automobiles.  Parsons has clearly not been a fire origin and cause analyst for the last 35 years as he has represented numerous times to courts, juries and opposing parties across this country.[67]  In fact, in a Daubert hearing in *Rager v. G.E.*, where he was subsequently allowed to testify, Parsons stated he was involved in no other types of work over the past 30 years other than fire origin and cause analysis.[68]

---

[63] The Articles indicate that Wright Warranty Services, which was a company formed dealing with mechanical service agreements at car shops, had its name changed to WCC (Wright Communications) and then became the phone business without changing its corporate purpose.

[64] The Articles list him as having the title of President.

[65] See "Exhibit 14", Kannally deposition, p. 20, et. seq.

[66] See Articles of Incorporation of Ringer Construction Company, annexed as "Exhibit 16."

[67] As discussed later in this brief, Parsons really started doing fire investigative/expert work when he began to work at the Traveler's laboratory around 1999 in Connecticut and became very close with Traveler's Vice President, Mr. John Machniki.  This is also completely consistent with Mrs. Carolyn Wark's testimony.

[68] See *Rager v. G.E.* daubert transcript, page 62, annexed as "Exhibit 17."  However, in *Philadelphia Contributorship* Parsons tried to emphasize his experience in automotive design and analysis and said 10-20% of his work was non-fired related "mechanical or electrical events."

Q: Tell me what work you've done in the automotive industry.

**A: Part of my job is to look at automotive design and analysis.**

### C. *Parsons's False Testimony Regarding his Education*

Anytime Parsons is questioned about his college education, he will always lie and

state he completed two years of college.  In some circumstances, such as when crossed in

the Daubert hearing in *Rager*, Mr. Parsons lied and stated he has a college degree:

Q: You have a two-year college degree from Fitchburg State, is that correct?

**A: Yes.**

Q: And that degree was in the study of metal and woodworking?

**A: That's correct, sir.**[69]

Mr. Parsons lied again about his education in his trial testimony in *New Jersey*

*Manufacturers Association v. Electrolux*:

Q: Mr. Parsons, I want to talk to you about your education.  After graduating from high school, you spent two years at Fitchburg State College, is that correct?

**A: That is correct.**

Q: And that was, in fact, a two-year college, is that correct?

**A: No, that was a four-year college with a two-year program, sir.**

Q: Okay. So you did the two-year program?

**A: I did, sir.**

Q: And you completed the two years?

**A: I did.**[70]

In his deposition on March 9, Parsons was first confronted with why he consistently gave

false testimony that he completed two years of college.  He stated he was being honest in his

mind because he went to Fitchburg in 1976 and 1977.  He stated he went one semester in each

year so, therefore, he could state he went two years of school. [71]  Parsons was asked if he thought

---

Q: Currently?

**A: Currently….**

[69] See page 147 of Parsons cross-examination in *Rager*, annexed as "Exhibit 17"

[70] See *New Jersey* trial transcript, page 33-34, "Exhibit 9."

[71] See Parsons video deposition clip, annexed as "Exhibit 18," manually attached as an exhibit and not including on this Court's ECF system.

that others would have the misconception that he completed two full years of college by him

testifying to the same:

Q: But if you say you completed two years of college, don't you expect that federal judge to think that you cumulatively had two years of college?

**A: No, what they think, I can't control what they think.  I'm telling you that I went in 1976 and 1977.**

Q: So if they interpret that as being two years cumulative of college, do you look at that as just their bad luck in believing that?

**A: In believing what?**

Q: That you went two years cumulatively to college?

**A: If they made that assumption I can't control that.**[72]

**...**

Q: So if the judge interpreted this to mean that you went two full years of college, then that was a mistake on his part.  Correct?

**A: Correct.**

Mr. Parson's also contends he did not flunk out of school.  He states he withdrew from

the classes he failed and it was the college's fault they didn't withdraw him.[73]  There were, in

fact, two courses that showed a "W" where Parsons withdrew from the course: Intro to Mountain

Hiking and Elementary Functions.  However, all of the courses in which he received an "F"

grade do not indicate he withdrew from those classes.  Further, the registrar of Fitchburg State

was deposed and she stated Mr. Parsons did not withdraw from the school.  Instead, he was not

allowed to return because of his low 1.3 GPA.[74]  His academic transcripts also lists "academic

failure" as the reason for his withdraw from the school.[75]

When the Fitchburg College transcripts were first received in this case, Mr. Parsons,

through defense counsel, represented to Plaintiff that Parsons had to drop out of school because

---

[72] For the complete back-and-forth regarding these semantics by Parsons see his March 9, 2017, deposition, "Exhibit 2"  (p. 29-39, 50-52, 54-61, 129-133)
[73] *Id* at p. 105
[74] See Fitchburg Registrar deposition excerpts, annexed as "Exhibit 19"
[75] Fitchburg College Transcripts are again annexed as "Exhibit 20"

his grades suffered after his father had a brain seizure and he had to work to take care of his mother.  However, his high school transcript shows Parsons struggled academically all through high school.  In fact, his GPA would not have passed the 2.0 mark if it had not been for his good grades in his band classes.[76]  In other testimony that Plaintiff has seen, when asked about why he withdrew from college after two years, Parsons never stated it had anything to do with his father. Instead, for example in *Slabach v. Electrolux* he stated: "Just I decided that teaching wasn't for me.  And with my automotive background even at that time, I decided to look into other career and educational opportunities."[77]

### D.  Parsons Misleads by Implying he was an Inductee in the Automotive Hall of Fame

Parsons lists as a "Special Honor" on his resume: "Automotive Hall of Fame, Dearborn, MI., July 19, 1993."  In his deposition in *KuhnKuhn v. Gill*, Parsons described this award:

Q: Now, as far as special honors, you have listed Automotive Hall of Fame.[78]  Could you explain what that is?

**A: Correct.  In 1993, because of my work through the ASE and through the After-Market Parts Association, and my involvement in the industry, I didn't realize that they were looking at a group of us.  And I was nominated in 1993 for the Automotive Hall of Fame, which is out in Midland, Michigan.**

However, The Automotive Hall of Fame stated in a letter to Plaintiff on March 8, 2017:

> **The Automotive Service Excellence (ASE) award is not an inductee in our museum.  ASE would simply send us a page to add to our book for a certain year that listed the names of those individuals who were awarded a certificate**
> **This is simply a recognition for a mechanic who has been ASE certified.  You do not find these names within the museum itself.  It is just a large binder where these pages are kept and brought out if requested by the individual who visits us.**

---

[76] Littleton High School Transcripts are again annexed as "Exhibit 21"

[77] See *Slabach* deposition excerpts, pages 3-4, "Exhibit 9"

[78] When questioned by Parsons about this award his attorney emailed the undersigned a certificate he received from ASE that said his "name has been inscribed in the hall of fame." (annexed as "Exhibit 22").  Parsons has used his ASE certificate that mentions The Automotive Hall of Fame to imply that he is an inductee in the museum.

> **Mr. Parsons stating in any way that he is an "inductee" in our museum is completely false.**
>
> **I have attached a page from the ASE website with a brief overview of what the organization is all about.  You may want to visit that site for any other information that could help you.[79]**

Parsons was never "nominated" for the Automotive Hall of Fame by any person or organization.  He is simply an ASE certified mechanic.  For him to imply he has some sort of additional award from The Automotive Hall of Fame is not true.  Moreover, the ASE mechanic's certificate award has nothing to do, at all, with any "After-Market Parts Association."  Nor does it have anything to do with Parsons's "involvement" in any industry as he so stated under oath.

### III. Defendant, Traveler's Insurance Company, Groomed Parsons to Serve as an Expert Witness

Defense counsel and defendant, Traveler's Insurance Company, are intimately familiar with Mr. Parsons.  As stated above, Carolyn Wark testified Traveler's was a "substantial" client of The Wright Group, Inc. when they were doing insurance adjusting work.  Great American was also a client of WGI during the 90's and have used Parsons as an expert on numerous occasions since that time where Parsons has also given false testimony.    In 1998, the oldest case of Mr. Parsons's found by Plaintiff, if not his very first case, even remotely involving a fire, was a case where Traveler's and its counsel in Sonnier were involved captioned *Namerow v. Traveler's*.[80]  According to Parsons, he was part of a "team" that burned a Mercedes Benz in an attempt replicate the fire.  He said he was hired because he was "a qualified car fire expert."  Parsons

---

[79] See email from The Automotive Hall of Fame, annexed as "Exhibit 23"

[80] The attorneys representing Traveler's in this particular case, Tedford & Pond, have used Ron Parsons extensively over the past two decades.  According to a former WGI employee a former law partner, Mr. Henry (the law firm was formerly called Tedford & Henry), even today, represents Parsons and WGI on various issues of their business.  In fact, according to this former employee, Henry is frequently retained by Parsons when he faces a Daubert challenge.

stated in his deposition that remembered being a fact witness in the case.[81]  However, Traveler's disclosed Parsons as an expert and listed the grounds for his opinion as having "background and experience (to) qualify him to discuss the similarities between the test vehicle and the vehicle burned at the Namerow residence."[82]

Plaintiff believes it was at this time Parsons met Mr. John Machnicki[83], a <u>Vice President of Traveler's</u>, who was in charge of and managed Traveler's laboratory that determined the origin and causes of fires.[84]  In 1999, Machnicki and Parsons "started (their) testing for lint collection analysis, lint ignition analysis and fire transport through ball hitch style dryers…."[85]  Through Machnicki's training, Parsons became a go-to expert for the lint ignition theory in dryer fires and made millions of dollars providing expert testimony for Traveler's and other insurers in various cases across the United States.  In his deposition in *Phila. Contributorship v. Electrolux*, Parsons emphasized the many, many "informal classroom" hours he spent with Machnicki, sometimes weeks at a time for 12 hours per day.[86]  He said he spent hundreds of hours with Machnicki working on particular projects and that Machniki did not charge him for his time and he did not charge Machnicki for his time.[87]  However, when asked if their "informal" time together always

---

[81] Parsons deposition, "Exhibit 2", page 231, 237-238.  The Mercedes burn experiment was excluded from evidence by the Court.  Parsons deposition was on March 11, 1998.  He went out and obtained his fire investigator certificate from NAFI the same year.

[82] It was implied that Parsons was a fire investigator in the Namerow case and Wark was questioned as to why she didn't remember Parsons doing fire investigation on this case.  The Plaintiffs in *Namerow* objected to the experiment and raised issues about similarities in the vehicles Traveler's burned. That is  why Parsons was listed as an expert because he was the one who located the vehicle for Traveler's (he was from that area and had been doing adjusting for Traveler's for many years) and was ASE certified and had been an adjuster on vehicle for 20 years.  Therefore, he was qualified to testify that the Mercedes burned was substantially similar to the Namerow vehicle.  See Namerow Disclosure of Parsons, "Exhibit 25."

[83] See p. 49, lines 2-8 and p. 51, line 7-11, of Parsons deposition in *Philadelphia Contributorship v. Electrolux*, the excerpts being annexed as "Exhibit 24."

[84] The Traveler's lab was previously known as the LP&E Laboratory.

[85] *Id. at*  p. 27.

[86] *Id.* at p. 51.

[87] *Id* at p. 52.

involved a particular project they were working on, Parsons responded:

> **Not always.  Sometimes we would undertake projects just for training and education and then we may use that data at a later date in training seminars, but it becomes our general body of knowledge….**

This begs the question: why would a Traveler's Vice President spend hundreds of hours, one-on-one, with Parsons and not charge for his time?  According to Carolyn Wark, Wright Group's past president, Parsons was just beginning fire investigation work when she left in 2000.  Moreover, the NAFI (National Association of Fire Investigators) did not certify Parsons as a fire investigator until 1998.[88]  What did Parsons have to offer Machnicki, who ran the Traveler's fire laboratory and managed very bright and highly credentialed scientists?[89]  Did Mr. Parsons trick Machnicki and Traveler's into believing he was a highly credentialed expert?  To the contrary, Traveler's knew that Wright Group, Inc. was an insurance adjusting and appraisal agency and it had been since its inception.  Machnicki himself knew, at least as far back as 1997, that Parsons was not a qualified fire expert and did not utilize him for such testimony, report, or deposition in an early fire case in which Traveler's retained him.

Considering the knowledge Traveler's has of Parsons work history, the volume of work done by Parsons for Traveler's, the one-on-one informal time Parsons has spent with Traveler's vice president, and the volume of cases in which Parsons has been retained by Traveler's current counsel, it is unreasonable to suggest Parsons has been able to evade detection and "trick" Traveler's and its attorneys.  Plaintiff has only obtained an _extremely_ small amount of Parsons's testimony and there is false and inconsistent statements in almost every instance where there is

---

[88] Parsons says he didn't need to be certified as a fire investigator and was hired by insurance companies based solely on his experience.  This despite that the NFPA (the national standards for fire investigation) certifications began in 1992 and the NAFI certifications prior to that began in 1982.
[89] Parsons has also boasted about his contacts with Dr. Vaughn Adams, a safety engineer at the Traveler's lab.

any questioning regarding his qualifications or work history. At the very least, counsel[90] and/or Traveler's have known, or should have known, and become aware of his inconsistent testimony over the last two decades and have continued to use his services.[91]

If the Court will so allow, Plaintiff would respectfully request the defendant insurers, and their attorneys, Tedford & Pond, produce all testimony they have of Mr. Parsons where he has testified as an expert (or fact witness such as the Mercedes fire case of 1997) on their behalf to inquire if they, directly or through their counsel, have allowed Parsons to give inconsistent, false and intentionally misleading testimony in other cases as occurred in Sonnier.

### IV. Ronald Parsons should be Held in Contempt

Parsons and WGI should be held in contempt for failing to comply with this Court's order that required production of the Stanphyl Road Irrevocable Trust by January 24, 2017. (Doc. 281). The documents were not given to Plaintiff until February 9, 2017, and the Stanphyl Road Irrevocable Trust was not produced. Instead, Parsons, through Traveler's attorney[92], asserted a diligent effort could not located a copy of the trust and that it was "dissolved in 2009."[93] When asked for information regarding their attorneys who may have a copy of the document, they did not identify the attorney who finally produced the trust documents to Plaintiff through subpoena. Parsons's business partner/attorney Sidell told plaintiff he destroyed the trust documents because it had been over ten years.[94] A public records search revealed the trust still owned immovable

---

[90] However, Plaintiff does not have any evidence nor indication that Traveler's attorneys, Tedford & Pond, in Sonnier actively encouraged or assisted Parsons in giving perjured testimony.

[91] And this is understandable. Mr. Parsons comes across as *very* credible. Unless you knew, for a fact, that he was telling a lie you would never suspect dishonesty in anything he ever said. If Traveler's and Machnicki were genuinely duped by Parsons this shows how incredibly skillful Mr. Parsons is at telling lies.

[92] Again, Plaintiff has seen no indication that defense counsel had actual knowledge of Mr. Parsons's false statements.

[93] A public record was subsequently found that showed the trust appeared before the Uxbridge Zoning Board to request a variance on property adjacent to the Parsons's and LaFrance's house.

[94] To remind the Court, Sidell's account makes absolutely no sense: He stated the trust he drafted was destroyed,

property.  A very obscure document of meeting minutes from the town of Uxbridge, where WGI is located, showed the trust actively working on at least one variance request in 2015.[95]  To this day, the trust holds title to some land on which WGI has a warehouse.

The movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence: (1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order. *Petreoleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F. 2d 392, 401 (5th Cir. 1987). Willfulness is not an element of civil contempt. *Id.*  After the movant has shown a prima facie case, the respondent can defend against it by showing a present inability to comply with the subpoena or order." *Id.*  Proceedings for civil contempt are between the original parties, and are instituted and tried as part of the main cause. *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 445 (1911). Sanctions for civil contempt are meant to be "wholly remedial" and serve to benefit the party who has suffered injury or loss at the hands of the contemnor. *Petreoleos Mexicanos*, 826 F. 2d at 399.

For criminal contempt, it requires proof beyond a reasonable doubt and due process. Sentences for criminal contempt are punitive in their nature and are imposed primarily for the purpose of vindicating the authority of the court. *Id.*   A district court may conduct civil and criminal contempt proceedings together.  Such a practice is permissible. *Id.*  The Court itself has authority to initiate the process leading to punishment and charges do not have to be referred at a prosecutor. *U.S. v. Williams*, 622 F. 2d 830 (5th Cir. 1980).

---

yet he had in his possession property transfer documents for the trust that were drafted the same day.  When Sidell was asked during his deposition about the purpose of the trust he refused to reveal its purpose saying, "it doesn't matter what the judge said.  It's attorney-client privilege."

[95] This document was attached to Plaintiff's Opposiiton to Defendant's Motion to Quash the deposition of Moss Sidell.

Respectfully, plaintiff requests Wright Group, Inc. be held liable for both civil and criminal contempt for disobeying this Court's order.  Plaintiff's counsel has spent hundreds of unnecessary hours investigating, subpoenaing, traveling, deposing, and re-deposing as a result of an outrageous disregard for courts all across the county and, specifically, this Court.  A contempt finding should be civil in nature to allow Plaintiff to recoup at least some of her costs and attorney's fees necessitated by Parsons's conduct.[96]  The finding of contempt should be criminal in nature as Parsons has shown he has no respect for the authority of this Court or any other court.  There is no better instance where a Court is justified in vindicating its authority.

Parsons should also be found guilty of perjury for the same reason.[97]  Implicitly, a perjury conviction of record, with even a nominal financial penalty, will sufficiently curtail years of misleading State and Federal courts.  Parsons has made, and continues to make, millions of dollars each year by falsifying his resume and lying about his credentials in depositions, Daubert hearings, and trials all across the country.  If Parsons is excluded as an expert in this particular case,[98] which he should be, this does not ensure he will not continue giving false testimony in other courts.  The most effective way to stop Mr. Parsons from continuing his multi-million dollar fraudulent enterprise is for him to be identified with a criminal conviction for giving false testimony, which he has clearly done in this case and many others.  Otherwise, Parsons and Wright Group, Inc. will continue making a mockery of opposing parties and courts all across

---

[96] Plaintiff's research has shown that a finding of contempt requires the disobedience of a court's order.  If Plaintiff is correct, Parsons lies under oath in his deposition in this case are not grounds for a finding of contempt.  However, Plaintiff believes a very real question exists as to the defendant insurers knowledge in regards to the large volume of inconsistent testimony Mr. Parsons has given over the last 15-20 years.

[97] 18 U.S.C. §401 gives the Court power to punish by fine or imprisonment contempt of its authority "misbehaving of any person in its presence or so near thereto as to obstruct the administration of justice."

[98] A Motion to Strike under Daubert is forthcoming.  In addition to his lying under oath and his lack of qualifications, Parsons opinion as to how the fire occurred defies science and even common sense.  His opinion as to cause was not included in his report, is not scientifically possible and has never been tested by himself or anyone else.

America.

Respectfully Submitted:


_____/S/ Joshua Lewis_____
JOSHUA M. LEWIS, No. 33244
1720 Kaliste Saloom Rd., Ste. C8
Lafayette, LA. 705038
(337) 552-2057
(225) 341-8162 - Fax


TONY CLAYTON, No. 21191
MICHAEL FRUGE, No. 26287
607 N. Alexander Ave.
Port Allen, LA. 70767
(225) 344-7000 - Phone
(225) 383-7631 – Fax

Garry Lewis, No. 08839
17457 Wes Mclin Rd., suite A
Livingston, Louisiana 70754
(225) 686- 1111   -  Phone
(225) 686 -7584  -   Fax


## Certificate of Service

I certify that a copy of the above has been served on all counsel of record this 16th day of March, 2017, by this Court's electronic filing system.


____/S/ Joshua Lewis_____

26